## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21240-Civ-SCOLA/TORRES

GLOBAL LIFE TECHNOLOGIES CORP.,
a Delaware Corporation,

     *Plaintiff*,

v.

MEDLINE INDUSTRIES, LP.,
f/k/a/
MEDLINE INDUSTRIES, INC.,

     *Defendant*.

_____/

### *REPORT AND RECOMMENDATION ON*
### *MOTION TO ENFORCE SETTLEMENT AND FOR SANCTIONS*

This matter arises on a renewed Sealed Motion to Enforce Settlement Agreement that Plaintiff filed in the action. [D.E. 83].  After full briefing on the motion, following supplemental discovery that the Court Ordered at the time the initial Motion was filed, the Court held a two-day evidentiary hearing in order to resolve the factual disputes that remained in the record. [D.E. 112, 113].  The Court also Ordered post-hearing supplemental memoranda from the parties to address the various legal and factual issues that required resolution from the Court. [D.E. 110, 111].

Having reviewed the evidence at the evidentiary hearing, the briefing, the relevant authorities, and the record as a whole, Plaintiff's motion should be **GRANTED** in part and **DENIED** in part.

1

## I.  BACKGROUND & FINDINGS

### A.  _Plaintiff's Suit for Willful Patent Infringement_.

The original complaint in the action alleged that Plaintiff manufactured NOZIN® brand products, including the specific product at issue here that is a NASAL SANITIZER® antiseptic preparation, which was alleged to be highly regarded in the industry and sold under several related United States Patents, including Patent Numbers 8,999,406; 9,463,212; 9,943,561; and 10,307,452 (the "Asserted Patents"). Beginning in 2016, Defendant distributed the patented NOZIN® NASAL SANITIZER® to hospitals and other healthcare facilities.

Defendant Medline is a competing manufacturer of medical products of all types.  The Complaint sued Medline for patent infringement, alleging that Medline began creating and selling an infringing product, which it marketed and sold as the "Antiseptic Nasal Swabs Ethyl Alcohol 62%."  Defendant denied the allegations of patent infringement and asserted various defenses to the claims.

Before the case proceeded to final adjudication the parties negotiated and entered into a Settlement Agreement in September of 2020.  The agreement provided that Plaintiff would dismiss the Action without prejudice, in exchange for Medline's express promise and assurances that by December 31, 2021, Defendant would cease selling the prohibited Medline nasal swabs that were defined, in paragraph four (4) of the Settlement Agreement, as the "1.0 Nasal Swabs".

The Agreement further provided, in paragraph six (6), that Medline would completely phase-out all further activity pertaining to the 1.0 Nasal Swabs by December 31, 2021, at which point Medline would never again "manufacture, import,

2

offer for sale, distribute, use, or sell" the 1.0 Nasal Swabs, nor would it "induce others in the United States to practice" the 1.0 Nasal Swabs.  The phase-out period was conditioned on Medline "develop[ing] a nasal swab formulation that does not use glyceryl laurate…" *Id.* (emphasis added).  These warranties were included in the "Cease and Desist" provision of the Agreement.

The Court dismissed the case, per the parties' settlement, but expressly reserved jurisdiction to enforce the terms of the Agreement. [D.E. 27].  The Court therefore incorporated by reference the terms of the Cease and Desist provision as part of the Court's Order that closed the case.

### B.    ***Medline's Breach of the Settlement Agreement***

After the dismissal of the action following the parties' agreement, Plaintiff discovered that there may have been a breach of the Agreement.  Plaintiff contacted Medline in a good faith effort to address its concerns without court involvement, at which point Plaintiff pointed out that that Medline violated the Agreement by continuing to sell the 1.0 Nasal Swabs despite its commitment not to do so.  More specifically, on February 1, 2022, Plaintiff placed Medline on notice and requested that Defendant provide an accounting of all 1.0 Nasal Swabs that had been sold in violation of the Settlement Agreement.

Plaintiff argues now that, instead of being honest about its ongoing violations of the Settlement Agreement, or *at a minimum* conducting any investigation into the prohibited sales, Defendant responded with a lawyer's snippy, two-line response stating that Defendant was "in compliance with the settlement agreement," and that Plaintiff was "mistaken" about the clear violations.  Plaintiff argues that this first

3

response was either knowingly false when in made, or grossly negligent and in reckless disregard for the truth. At a minimum, this terse response evidences Medline's refusal to properly investigate its inventory, sales records, and shipments of the 1.0 Nasal Swabs. Had Medline engaged in any due diligence whatsoever, Plaintiff argues, this enforcement proceeding could have been avoided.

Instead, these proceedings have been multiplied, according to Plaintiff, unnecessarily.  As support for this position, Plaintiff points out that this initial response was not the only time that Medline misrepresented the facts to Plaintiff and, later, the Court (which repeated misrepresentations undermine the defense that it acted in good faith).  Specifically, on February 9, 2022, Plaintiff sent a follow-up letter demanding that Medline provide "details of [Defendant's] compliance" with the Settlement Agreement, failing which Plaintiff would seek immediate judicial relief and all appropriate relief.  Again, Medline rejected Plaintiff's overture and, instead, again claimed that Medline "no longer sells" the 1.0 Nasal Swabs.  This was again knowingly false when made, or in reckless disregard for the truth, according to Plaintiff, because while these denials were forthcoming Medline was reaping thousands of dollars in prohibited sales in violation of the Agreement.

In fact, Medline's own website continued to offer the enjoined products for sale as of January 25, 2022.  It was at that point that Plaintiff's investigators/staff purchased from Medline, on January 24, 2022, samples of the prohibited 1.0 Nasal Swabs.

At that stage of its investigation, Plaintiff filed its first motion for enforcement of the Agreement and moved to reopen the case. [D.E. 33]. A hearing was held on that first proceeding where Medline tried to cast doubt on whether those samples were actually sold by Medline. The Court deferred an immediate adjudication of the motion and granted Medline another opportunity to properly investigate the circumstances of the alleged sales and mitigate the parties' and the Court's time and expense. The Court also granted Plaintiff the right to seek relevant discovery to get to the bottom of the dispute.

After initially rebuffing the Court's efforts by continuing the litigation, Medline conceded on March 22nd that these particular sales were among many other sales of the prohibited 1.0 Nasal Swabs that were made by Medline in the year 2022, in violation of the Settlement Agreement. Medline claimed, however, that this was a one-off transaction and that, by that point, it "has none of the old swabs in inventory available for shipment. None." That turned out to be wrong, again. Indeed, on March 12, 17, and 22, 2022, Medline wrongly certified under oath that it was not: (a) "making, selling, or distributing [the 1.0] 62% alcohol nasal swabs that contain glyceryl laurate;" (b) "making, selling, or distributing kits that include such swabs;" or (c) "making, selling, or distributing such swabs in any other manner." [D.E. 56-3, ¶9].

Despite these unambiguous representations made to the Court, in written form as well as at oral argument, Medline later conceded in its corporate representative's deposition, taken April 15, 2022, that it turned out that many more sales of the 1.0

Nasal Swabs had in fact been made, to the tune of $207,000.  That occurred because, when first alerted to the problem, Medline admittedly did not place a distribution hold on any 1.0 Nasal Swabs throughout its distribution network that includes multiple distribution centers that stock product and make deliveries.  Medline concedes that, had this hold been placed in February, a substantial amount of product would not have been sold.  But, Medline admits that it did not believe it needed to place this hold directive until March 10, 2022, when Plaintiff notified Medline of the completed January transaction and filed memoranda with the Court outlining why it suspected Medline was continuing to violate the Agreement.  Medline concedes that only then did "urgent email to all distribution centers (MHE 21) placing all swabs on hold—1.0 and 2.0 inventory—until the matter could be sorted out. Medline also directed that the old artwork be updated and that the regulatory filing be corrected, again within one day after Global Life informed Medline of these matters." [D.E. 111 at 5].

Following further discovery and exchange of information between the parties over many months, Plaintiff finally became satisfied that no further sales were being made.  But that was only after discovering that, as conceded by Medline, additional shipments of the product were made that yielded an additional $7,965.95. [D.E. 77]. These referenced $7,965.95 in sales were "shipped after March 10, 2022" [D.E. 77, ¶2] despite the fact that Medline's earlier declarations averred that Medline had not and would not ship any further 1.0 Nasal Swabs.

But Plaintiff then renewed its Motion to enforce the settlement agreement, arguing that the parties conferred jurisdiction on the Court to compel compliance with all provisions of the Agreement, and now that additional efforts were required to obtain Plaintiff's benefit of its bargain the Court should award compensation to Plaintiff for its consequential damages, nominal damages, lost revenue, and lost customers stemming from Medline's continued sales of the 1.0 Nasal Swabs.  At a minimum, Plaintiff argued, even if the Court could not entertain a traditional claim for damages under the auspices of a motion to enforce, the Court had equitable jurisdiction under Florida law to order restitution in the form of disgorgement of Medline's profits from its unlawful sales of the 1.0 Nasal Swabs after December 31, 2021. [D.E. 83].

C.    *Medline's Position and Defenses*

For its part, Medline maintains that its failure to comply with the Cease and Desist provisions were unintentional and merely a product of administrative errors on its part.  Its original defenses to Plaintiff's arguments were borne out of a genuine belief, now proven incorrect, that it was not selling the 1.0 Nasal Swabs.  So, Medline argues, there is no need for any relief on the Motion because it is now moot.  And there is no basis to award breach of contract damages or fees through this enforcement motion given the terms of the parties' Agreement and the Court's limited jurisdiction.

The record does corroborate that Medline complied with the contractual obligation to develop and test a new 2.0 product as well as a 3.0 product as a backup. The agreement also called for Medline to stop selling the 1.0 product after the end of

7

2021, which Medline intended to also satisfy by ceasing manufacture of the product well before the end of 2021.  Medline's principals, especially its product manager Alana Cecola, believed that that, based on the normal sales rate of the swabs, and consistent with Medline's normal inventory practices, the 1.0 Nasal Swabs would have sold out before the end of 2021.  And that was also reflected in Medline commencing sales of its 2.0 swabs in the fall of 2021.

As it turned out, however, many 1.0 Nasal Swabs remained in inventory after December 2021 and past the permitted January 31 distribution deadline.  This inventory was already shipped to Medline distribution centers in various parts of the country where they were available to be filled for new Orders past that date.  Medline vehemently denied at the time that it was still selling any further 1.0 product, yet as those representations were being made products were still being shipped.

Medline concedes that it could have had its sales and inventory personnel confirm with the distribution centers directly if any inventory was still available.  Medline did not do so, even after Plaintiff initially demanded an accounting of its compliance, because Medline did not envision that it had any inventory left to sell.  It was only after reviewing Plaintiff's declaration attesting to the investigator's purchase of product that Medline, on March 10, 2022, send an urgent email to all distribution centers placing all swabs on hold—1.0 and 2.0 inventory—until the matter could be reviewed.

After March 10, all remaining 1.0 swabs remained under quarantine. Medline did not destroy the swabs because of concerns with spoliation, and because Global

Life had suggested that it might seek to take possession of the remaining 1.0 swabs as a remedy.  Nonetheless, due to yet another error, Medline admittedly shipped an additional volume of swabs after March 10. Medline concedes, and the Court indeed finds, that "Medline's compliance with the settlement agreement after December of 2021 was far from perfect."

Nevertheless, the Court finds the testimony Ms. Cecola to be credible.  She credibly explained in her testimony at the December 2023 hearing that the mistakes that Medline committed were not intentional.  Rather, they were the product of assumptions that she and others had made that the 1.0 Nasal Swabs would have run their course in inventory before the end of 2021.  She admitted that she erred in this respect.  She also admitted that her declarations filed in support of Medline's position turned out to be wrong.  But she claimed, again credibly, that she did not intentionally mislead or provide false testimony to the Court.  And when she learned of the additional post March sales of product, she was genuinely alarmed and distraught as to yet another Medline failure with respect to its compliance with the Agreement. But she insisted that the failure was a negligent one, not an intentional or bad faith one.

## II.   ANALYSIS

### A.   *Standard of Review*

It is well-settled that district courts retain the inherent power "to summarily enforce settlement agreements entered into by parties litigant in a pending case." *Kent v. Baker*, 815 F.2d 1395, 1398 (11th Cir. 1987) (quotation omitted). "Indeed, the

power to implement a settlement agreement between the parties inheres in the district court's role as supervisor of the litigation, and the exercise of that power is entrusted to the court's sound discretion." *South Beach Suncare, Inc. v. Sea & Ski Corp.*, 1999 WL 350458, at *6 (S.D. Fla. May 17, 1999). In both the federal and state courts, settlements are highly favored and will be enforced whenever possible. *See Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994) ("We favor and encourage settlements in order to conserve judicial resources.").

In determining whether an agreement exists, we follow the principle that settlements should be enforced pursuant to general contract law. *See Robbie v. City of Miami*, 469 So. 2d 1384 (Fla. 1985). It is not for the Court to add or subtract any language from the face of a clearly-worded agreement. *See Malvaes v. Constellation Brands, Inc.*, 2016 WL 4007332, at *2-2 (S.D. Fla. June 23, 2016) (citing *Robin v. Sun Oil Co.*, 548 F.2d 554, 557 (5th Cir. 1997)). Nor should the Court add to a settlement terms that were not contemplated by or agreed upon by the parties. *See id.* (citing *Florida Education Ass'n, Inc. v. Atkinson*, 481 F.2d 662, 663 (5th Cir. 1973)).

In enforcing a settlement agreement that arises in federal litigation, "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Once a court enters an order of dismissal, it generally loses jurisdiction to further act on the case except to the extent that it specifically retains jurisdiction.  E.g., *American Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1320 (11th Cir. 2002) (enforcing agreement after dismissal because "even absent the entry of a formal consent decree, if the district court either incorporates the terms of a

settlement into its final order of dismissal *or* expressly retains jurisdiction to enforce a settlement, it may thereafter enforce the terms of the parties' agreement."); *Cohan v. Trattoria Romana, Inc.*, 20-CV-81437, 2024 WL 248765, at *7 (S.D. Fla. Jan. 5, 2024), *report and recommendation adopted,* 20-81437-CIV, 2024 WL 245265 (S.D. Fla. Jan. 23, 2024).  To this end, "a district court [may] retain jurisdiction to enforce a settlement agreement with consent of the parties and of the court, provided the district court issues an order requiring compliance with the settlement agreement." *Anago Franchising, Inc. v. Shaz, LLC,* 677 F.3d 1272, 1278 (11th Cir. 2012).  If the Court does not retain jurisdiction or limit its retention in specific ways, any proceeding to enforce that agreement "is for state courts, unless there is some independent basis for federal jurisdiction." *Kokkonen,* 511 U.S. at 382.

With respect to the Court's power to sanction the parties and counsel who appear before it, federal courts possess an "inherent power," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962).  That authority includes the ability to fashion an appropriate sanction for conduct that abuses the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). "The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

One permissible sanction is an assessment of attorneys' fees – an order instructing a party who has acted in bad faith to reimburse legal fees and costs incurred by the other side. *See Chambers*, 501 U.S. at 45.  Such a sanction, when

imposed pursuant to civil procedures, must be compensatory rather than punitive in nature.  *See Mine Workers v. Bagwell*, 512 U.S. 821, 826-830 (1994) (distinguishing compensatory from punitive sanctions and specifying the procedures needed to impose each kind).  In other words, the fee award may go no further than to redress the wronged party "for losses sustained"; it may not impose an additional amount as punishment for the sanctioned party's misbehavior.  *See id*. at 829 (*quoting United States v. Mine Workers*, 330 U.S. 258, 304 (1947)).  The necessary causal connection is appropriately framed as a but-for test: the complaining party may therefore recover only that portion of its fees that it would not have paid but for the misconduct.  *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1187 (2017).

A federal court also has a statutory basis to impose sanctions for bad faith and vexatious conduct by counsel.  The Court's authority to issue sanctions under 28 U.S.C. § 1927 is at least as broad as a court's authority to issue sanctions under its inherent powers.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1178 n. 6 (11th Cir. 2005).  Specifically, section 1927 provides that unreasonable or vexatious conduct may be sanctionable in certain circumstances:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

There are three essential requirements for an award of sanctions under Section 1927:

> First, the attorney must engage in unreasonable and vexatious conduct. Second, that unreasonable and vexatious conduct must be conduct that multiplies the proceedings. Finally, the dollar amount of the sanction must bear a financial nexus to the excess proceedings, *i.e.*, the sanction may not exceed the costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

*Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997) (internal quotations omitted).

The first requirement is satisfied "only when the attorney's conduct is so egregious that it is tantamount to bad faith." *Hudson v. Int'l Computer Negotiations, Inc.*, 499 F.3d 1252, 1262 (11th Cir. 2007) (citation omitted). In fact, "an attorney's conduct must be particularly egregious to warrant the imposition of sanctions" because the "attorney must knowingly or recklessly pursue a frivolous claim." *Id.* (emphasis in original) (citation omitted). Negligent conduct, standing alone, will not suffice as "something more than a lack of merit is required." *Id.* (citation omitted). The second requirement, relating to multiplying proceedings, is only satisfied when an attorney's conduct "results in proceedings which would not have been conducted otherwise." *Daniels v. Sodexo, Inc.*, 2013 WL 4008744, at *7 (M.D. Fla. Aug. 5, 2013) (citing *Peterson*, 124 F.3d at 1396). As for the final requirement, any sanction award must not be excessive in relation to the underlying misconduct. And, finally, "as an initial matter, the language of Section 1927 makes clear that it only applies to unnecessary filings after the lawsuit has begun." *Macort v. Prem, Inc.*, 208 F. App'x. 781, 786 (11th Cir. 2006) (citing *In re Matter of Yagman*, 796 F. 2d 1165, 1187 (9th Cir. 1986)).

**B.**   ***Jurisdiction to Enforce the Agreement through Disgorgement***

The first question presented in this matter is whether the Court has jurisdiction to grant any of the principal remedies sought in Plaintiff's renewed motion; namely, benefit of the bargain damages, consequential damages, nominal damages, lost revenue, lost customers stemming from Medline's continued sales of the 1.0 Nasal Swabs, and attorneys' fees and costs.  Alternatively, Plaintiff is seeking disgorgement of the profits Medline received from the sale of the unlawful 1.0 Nasal Swabs as an equitable remedy.

Medline takes the position that the Court's retention of jurisdiction does not extend to any of these types of remedies based on the limits on the Court's power in *Kokkonen*.  Alternatively, Medline argues that at best disgorgement is possible but only for the sales that occurred after February 2022 when Plaintiff first presented it with tangible proof of improper sales.  Prior to that, Medline argues, it had no reason to know or suspect that any wrongful sales were occurring at all so it would not be equitable to award disgorgement on those sales.

The Court's initial inclination was to deny all relief based on the language of the Agreement at issue and the manner in which the Court retained jurisdiction.  The Agreement, in the first place, does not contemplate any damages whatsoever as a remedy if Medline were to violate the Cease and Desist provisions.  The Agreement only reserves the right of the Plaintiff to pursue enforcement remedies generally but there is no specific remedy that the parties agreed upon.  It is generally established that the power to generally enforce a settlement agreement's terms is a limited one.

14

Breach of contract or tort claims that also arise from a settlement agreement clearly fall outside the scope of this Court's limited jurisdiction absent express indication otherwise. *See, e.g., Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.,* 939 F.3d 1145, 1156 (11th Cir. 2019) (if a court retains jurisdiction over a settlement agreement, it retains ancillary jurisdiction to enforce the agreement only where necessary "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.") (quoting *Kokkonen*, 511 U.S. at 380); *Vikas WSP, Ltd. v. Econ. Mud Prod. Co.,* 23 F.4th 442, 453 (5th Cir. 2022) ("If the district court could hear Economy's fraud claim through its retained power to "enforce the settlement," we see no reason why it could not hear any tort claim arising from or related to the settlement. That would stretch retained jurisdiction too far. The power to enforce a settlement is just that; it is not a power to reach all related claims and theories of recovery."); *National Presto Indus., Inc. v. Dazey Corp.,* 107 F.3d 1576, 1581 (Fed. Cir. 1997) (ancillary jurisdiction to enforce a settlement agreement as part of consent judgment does not include jurisdiction to enter declaratory judgment that agreement was breached).

These settled principles easily dispose of most of the remedies suggested in Plaintiff's renewed motion. Consequential damages, "benefit of the bargain" damages, including consequential attorneys' fees and costs, are all damages that could be pleaded in an action at law for breach of contract. But that type of relief goes far beyond "ancillary jurisdiction" to enforce an agreement. As the Fifth Circuit explained in *Vikas*, 23 F.4th at 452, a court's retention to generally enforce an

agreement post-dismissal is limited to its terms. "It's not a blank check. It doesn't authorize the district court to reach new issues or issues that only relate to the settlement. The court may decide 'whether and under what terms' to enforce the settlement, but it may go no further without an independent basis for jurisdiction.") (quoting *Wise v. Wilkie,* 955 F.3d 430, 436 (5th Cir. 2020)).

Applying these established principles here, and given the Court's discretion in whether and how to enforce a settlement given the Court's limited jurisdiction, it would be ordinarily appropriate for the Court to decline such exercise of jurisdiction in favor of a proper breach of contract action that entitles a plaintiff to the full panoply of remedies available under state law. *See, e.g., Goudelock v. McLemore,* 985 F. Supp. 2d 816, 818 (N.D. Miss. 2013) (denying motion to enforce agreement through contract claims "because the facts surrounding a breach of contract claim are largely independent from the facts of the original suit[;] it is more appropriately brought as a new contract action seeking to enforce the Settlement Agreement."); *Triple S Props., Inc. v. St. Paul Surplus Lines Ins. Co.,* No. 08-CV-796, 2010 WL 3911422 (N.D. Tex. Oct. 5, 2010) (denying motion to enforce settlement agreement where claims of fraud and mistake, as well as the contractual counterclaims, were not sufficiently tied to the settlement's restrictions).

Of course, the jurisdiction to enforce a settlement agreement naturally requires a court to assure compliance with the material provisions of the agreement that were negotiated and memorialized in the agreement. So if, for instance, a party does not make payments due under an agreement the Court should not decline

16

jurisdiction even though the remedy is contractual in nature. Clearly an award of damages in that instance is "contractual" but at the same time explicitly contemplated by the literal terms of the agreement. Ancillary jurisdiction would thus properly lie to compel enforcement of that arrangement through the entry of a judgment at law that incorporates the balance of the monies owed. *See, e.g., Crowley Mar. Corp. v. Linda Mar Imports Inc.,* 576 F. Supp. 3d 1268, 1275 (S.D. Fla. 2020) (enforcing agreement where "Defendant committed a material breach of the Settlement Agreement when it failed to adhere to the payment terms, and Plaintiff is entitled to a final judgment for the stipulated damages, minus any payments made under the agreement."). This would be entirely in keeping with the court's retention of jurisdiction to enforce the clear and unambiguous terms of a parties' agreement. *See, e.g., Schwartz v. Fla. Bd. of Regents,* 807 F.2d 901, 905 (11th Cir. 1987) ("A settlement agreement is a contract and, as such, its construction and enforcement are governed by principles of Florida's general contract law.").

Here, had the parties agreed on express payment terms in the event of a breach, or even liquidated damages, the Court would be hard-pressed not to enforce those explicit contractual remedies in the agreement. An action to enforce an agreement in such a circumstance would entitle Plaintiff to a remedy in this jurisdiction. And that would also include attorneys' fees and costs in the enforcement process if the parties had agreed on such a remedy. But in this case, there is no provision in the agreement laying out specific remedies for a breach, liquidated damages for wrongful distribution of product, or attorneys' fees to compel

enforcement.  Indeed, the parties' agreement did not contemplate entry of a consent judgment to enforce its terms; rather, the parties agreed on a dismissal without prejudice.  That is how the case was terminated by the District Judge upon the filing of the Rule 41 dismissal motion.

So, consequential damages that only indirectly flow from an alleged breach, like attorneys' fees incurred in the process, are not directly tied to the remedies agreed upon by the parties.  To be sure, Plaintiff may still be entitled to such remedies, but that would be the case only in a new direct action for breach of contract. That remedy does not fall within the limited ancillary jurisdiction the Court retained here "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."). *Kokkonen*, 511 U.S. at 380.

In hindsight, however, the Plaintiff's alternative argument for restitutionary remedies for the breach of the Cease and Desist provisions has a stronger foundation. The Eleventh Circuit's decisions with respect to the legal significance of retaining jurisdiction to enforce a settlement are highly relevant in this respect and belie the Court's initial skepticism of that remedy.  Judge Marcus reasoned for the Court in *American Disability Ass'n, Inc. v. Chmielarz* that a judicially sanctioned change in the parties' legal relationship follows from entry of an order of dismissal that "approv[es] the settlement agreement and then expressly retain[s] jurisdiction to enforce its terms, . . ." 289 F.3d at 1321.  In that case, such a finding was relevant to a claim of prevailing party fees after entry of the dismissal Order.  The settling party opposed an award of fees, arguing that the parties had settled the case and never

memorialized their agreement in a consent decree or consent judgment.  Thus, no change in the legal relationship of the parties took place to trigger fees under the ADA.  But the Court's opinion made clear that an Order dismissing a case and retaining jurisdiction to enforce an agreement's terms is effectively a "consent decree" for purposes of the statute.  As the Court explained:

> The formal entry of a consent decree was wholly unnecessary and would not affect the status of the parties or the district court's power to enforce the terms of the settlement. Rather, by approving the settlement agreement and then expressly retaining jurisdiction to enforce its terms, the district court effected precisely the same result as would have been achieved pursuant to a consent decree.

*Id*.  The court further explained that a "formal consent decree is unnecessary in these circumstances because the explicit retention of jurisdiction or the court's order specifically approving the terms of the settlement are, for these purposes, *the functional equivalent of the entry of a consent decree.*" *Id*. at 1320.

A similar result followed in another fee case, *Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach,* 353 F.3d 901 (11th Cir. 2003), where the Court again held that a dismissal order on a parties' settlement, that retained jurisdiction to enforce the agreement, entitled the plaintiff to an award of attorneys' fees.  "While the settlement agreement in this case is unusual, we find that the terms at issue regarding attorney's fees and costs are a material part of their agreement and are neither invalid nor unenforceable.  We have no basis under § 1988(b) for ignoring the provisions that the parties bargained for in an arms-length transaction." *Id*. at 908.

Why does this matter here?  After all, the parties stipulated to dismissal with each party their own fees and costs, and further agreeing to settlement terms that

explicitly disclaimed any right to fees even in the event of a breach.  The answer is clear that, at least in the Eleventh Circuit, an Order dismissing a case and retaining jurisdiction to enforce the settlement's terms is "effectively a consent decree" even though it was not styled as such.

So the terms of paragraph 6 of the Agreement, which encompasses the Cease and Desist provisions that we now know were violated by Medline, are effectively a consent decree that the Court can fully enforce, just as if the Court had formally issued a consent decree or consent judgment to adjudicate the patent claims.  The parties here did not agree on payment terms, but they did agree on a consent decree's remedial measures that are tantamount to a mandatory/prohibitory injunction.  *See, e.g., State of Ala. v. United States,* 304 F.2d 583, 590 (5th Cir. 1962), *aff'd sub nom. Alabama v. United States,* 371 U.S. 37 (1962) ("Mandatory injunctions affirmatively compelling the doing of some act, rather than merely negatively forbidding continuation of a course of conduct, *are a traditional tool of equity.* Long ago we said 'an injunction may compel the performance of a duty.'" (emphasis added).

So the agreement we are presented here incorporated *equitable relief* in the form of a mandatory injunction (which required Medline to reconstitute its nasal swabs) as well as a prohibitory injunction (which forbade Medline from selling any further 1.0 Nasal Swabs).  In short, we can call these provisions the "consent decree" provisions of the Agreement, as Judge Marcus defined that term for our purposes.  We also know that Medline breached that consent decree, in part, by not complying

with the prohibitory injunction and allowing 1.0 Nasal Swabs to be distributed after the January 31st deadline in the Agreement.

This may not trigger a purely legal remedy that falls outside the four corners of the agreement, but it certainly triggers Plaintiff's right to an equitable remedy to enforce the express promises made by Medline to settle the case.  Disgorgement of profits generated by a breach of a consent decree in this manner is a well-recognized remedy by a court in equity.  As the Supreme Court long ago recognized,

> Such a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. . . . Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and to mould each decree to the necessities of the particular case.' *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754. It may act so as to adjust and reconcile competing claims and so as to accord full justice to all the real parties in interest; if necessary, persons not originally connected with the litigation may be brought before the court so that their rights in the subject matter may be determined and enforced. In addition, the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice.
> ….
> Nothing is more clearly a part of the subject matter of a suit for an injunction than the recovery of that which has been illegally acquired and which has given rise to the necessity for injunctive relief. To be sure, such a recovery could not be obtained through an independent suit in equity if an adequate legal remedy were available. . . . But where, as here, the equitable jurisdiction of the court has properly been invoked for injunctive purposes, the court has the power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law.

*Porter v. Warner Holding Co.,* 328 U.S. 395, 398-99 (1946).

The Supreme Court has recently reiterated that a federal court's equitable powers may be relied upon to grant a restitutionary remedy of disgorgement in certain circumstances "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession[.]" *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213 (2002).

A federal court's equitable powers, as illustrated by *Porter* and countless other cases, are fully consistent with Florida law that recognizes that disgorgement is an equitable remedy that may properly be invoked to prevent unjust enrichment. *See, e.g., Waldrop v. S. Co. Servs. Inc.,* 24 F.3d 152, 157 (11th Cir. 1994) ("[D]amages are equitable when 'they are restitutionary, such as in 'action[s] for disgorgement of improper profits.'") (citation omitted)); *Kratos Invs. LLC v. ABS Healthcare Servs., LLC,* 319 So. 3d 97, 102 n.2 (Fla. 3d DCA 2021); *Montage Grp., Ltd. v. Athle–Tech Comp. Sys., Inc.,* 889 So.2d 180, 196 (Fla. 2d DCA 2004) (finding remedy of disgorgement was appropriate for unjust enrichment claim); *King Mountain Condo. Ass'n v. Gundlach,* 425 So.2d 569, 572 (Fla. 4th DCA 1982) (disgorgement of secret profits as a remedy for breach of fiduciary duty was equitable in nature and could be awarded by the court without a jury finding).

Plaintiff has demanded disgorgement of Medline's sales from the 1.0 Nasal Swabs beginning January 1, 2022, which Medline concedes to be $208,244.61. These sums were paid to Medline in direct contravention of the consent decree portion of the Agreement that precluded Medline from making such sales after December 31st.

There is no doubt that any such sales should have inured to Plaintiff's benefit. And, indeed, Medline could have and should have more promptly resolved the pending dispute by tendering such sales immediately upon learning of its breaches. Equity demands that such sums should be disgorged as a direct remedial measure arising under paragraph 6 of the Agreement. And because the Court retained jurisdiction to enforce that consent decree, and its equitable powers are fully available to the Court in this respect, the Court's ancillary jurisdiction amply allows for an order disgorging such sums from Medline in favor of Plaintiff.

Medline does not entirely challenge the wisdom and fairness of this remedy, but does argue that any such payment should be more limited in time. Medline premises this position on the basis that Plaintiff has unclean hands. Specifically, Medline claims that "[w]hen Global Life first wrote Medline on February 1, 2022, Global Life held back key facts and evidence concerning the breach. Global Life only revealed this information to Medline upon filing this enforcement action on March 9 of that year. Based on this conduct by Global Life, the Court should order no relief in equity. At most, any disgorgement of profits should be limited to profits on sales made between January 1, 2022 and February 1, 2022. . . . It [is]w uncontroverted that Medline would have immediately placed a hold on 1.0 swabs on February 1, 2022 had Global Life not withheld the relevant information." [D.E. 111 at 1].

Medline's position in this respect is specious. Medline takes issue with how Plaintiff alerted Medline of its breaches, despite the fact that ample efforts were undertaken well before February 1 to alert Medline and its counsel of a problem.

Their response was an immediate "pound sand."  Plaintiff was forced to incur investigate expenses to prove its allegations, which Medline now argues was somehow unfair to Medline.  That could not be more indefensible.

The fact is that Medline could have, but did not, take all remedial measures necessary to ensure its compliance with the consent decree (i.e. the Cease and Desist provision).  It certainly complied in part, but a readily apparent and efficient measure to enforce its obligations would have been to alert all distribution centers in the event any remaining product were found on Medline's shelves.  To boot, rather than meeting Plaintiff halfway in this respect after being alerted to the problem, Medline took the opposite approach and repeatedly represented to the Court, in writing and in person, that Plaintiff was imagining things and that Medline had zero inventory with which to violate the Agreement.  Those multiple representations turned out to be *false*.  So, the Court finds that only Medline has unclean hands in this case.

Given that finding of fact, and consistent with the law that governs this dispute under the Court's ancillary jurisdiction, the Court is fully vested with the authority to order disgorgement of all profits incurred after December 31, 2021.  *All* sales that were made in violation of the consent decree's provisions must be disgorged.

### C.    *No Bad Faith Has Been Demonstrated to Warrant Sanctions*

Given the Court's finding that equity demands disgorgement of Medline's profits, we turn next to the principal demand that Plaintiff made in its original and renewed motion to enforce.  Plaintiff argues that Medline made numerous material misrepresentations – both to the Plaintiff and the Court – and that Medline also filed

declarations that contained false statements. Regardless of whether Medline was intentionally deceptive, or alternatively grossly negligent, sanctions are still warranted due to Medline's bad faith conduct.  Plaintiff persuasively argues that the Court should reject any assertion by Medline that this bad faith conduct was "innocent" or due to mere oversight. For example, Medline ultimately produced a sales report that documented sales of the 1.0 Nasal Swab through March 9, 2022, yet Medline filed its first sworn declaration the very next day (on March 10, 2022) claiming that it was not selling any 1.0 Nasal Swabs.  These repeated falsehoods should not be condoned and warrant an award of fees and costs at a minimum for the expense incurred by Plaintiff in pursuing this matter.

As logical and persuasive as these arguments are, the Court cannot award any sanctions, either against Medline under its inherent power or against counsel under section 1927, without finding as a matter of fact that they engaged in bad faith. Certainly the panoply of misrepresentations found in the record fully support a prima facie finding that sanctions are entirely appropriate.

But under the law that governs this dispute in this Circuit, bad faith must be found both objectively and subjectively.  The Court held an evidentiary hearing for this purpose.  Based on the findings the Court can make from that hearing, the Court finds that Plaintiff cannot meet both elements of this prerequisite despite the compelling evidence it has presented.

The Court' review of the standard for imposing sanctions under the Court's inherent power, for instance, shows that willfulness is an essential component of most

cases awarding such relief.  That is because the key to invoking a court's inherent power to sanction is a finding of bad faith. *See, e.g., In re Mroz,* 65 F.3d 1567, 1575 (11th Cir. 1995). Bad faith exists where a party or attorney knowingly or recklessly pursues a frivolous claim or needlessly obstructs the litigation of a non-frivolous claim. *See, e.g., Amlong & Amlong, P.A. v. Denny's, Inc.,* 500 F.3d 1230, 1242 (11th Cir. 2007). Under the doctrine of willful blindness, "knowledge can be imputed to a party who knows of a high probability of illegal conduct and *purposely* contrives to avoid learning of it." *Williams v. Obstfeld,* 314 F.3d 1270, 1278 (11th Cir. 2002) (emphasis added).

But based on the desire to circumscribe the court's inherent powers to avoid draconian relief, courts in our circuit apply a clear and convincing standard for the bad faith analysis.  *See, e.g., JTR Enterprises, LLC v. Columbian Emeralds,* 697 Fed. Appx. 976, 986 (11th Cir. 2017) ("Our review of the record convinces us that the district court did not abuse its discretion in concluding that Motivation failed to adduce *clear and convincing evidence* of bad faith. There is no doubt that there were red flags and that, with the benefit of hindsight, certain of them were conspicuous. However, we do not believe that the district court abused its discretion in concluding that the 'red flags' were not dispositive of bad faith."); *Roche Diagnostics Corp. v. Priority Healthcare Corp.,* No. 2:18-cv-1479, 2020 WL 2308319, at *4 (N.D. Ala. May 8, 2020) (collecting cases); *Zocaras v. Castro,* 465 F.3d 479, 483 (11th Cir. 2006) (requiring a "clear record of willful conduct" before imposing a sanction of dismissal) (citing *Betty K Agencies, Ltd. v. M/V Monada,* 432 F.3d 1333, 1339 (11th Cir. 2005));

*In re Brican Am. LLC Equip. Lease Litig.,* 977 F. Supp. 2d 1287, 1293 n.6 (S.D. Fla. 2013) (applying a "clear and convincing evidence standard to the request for dispositive sanctions" such as dismissal), *report and recommendation adopted*, 2013 WL 12092311 (S.D. Fla. Nov. 15, 2013).

Given this standard, Plaintiff's case for a finding of sanctions is a difficult one. Clear and convincing evidence of willfulness, or at least willful blindness, must be demonstrated for the Court to find that at least subjective bad faith is present. Obviously, had the Court found Medline's witness to be incredible, the case for subjective bad faith would have been clear, convincing and self-evident.  From the multiple times that untrue information was provided to the Court, under oath, one can readily find that sanctions would be warranted if those representations were intentionally false or willfully disregarding the truth.  Again, Plaintiff certainly made out a prima facie case for that finding and that is why an evidentiary hearing was warranted.

But bad faith requires that the Court also weigh the objective evidence of willfulness to the subjective intent of the parties involved.  The Court finds Ms. Cecola credible in an important and pivotal respect.  As the person at Medline most responsible for the representations that were made to counsel, and then to the Court and Plaintiff, her decisionmaking was certainly flawed but not willful.  Her explanation for why she believed Medline was not violating the consent decree was credible, even though we can also find that it evidences great negligence on her part and that of Medline.  But negligence is not the key to unlocking the Court's inherent

powers; only bad faith, that is the product of willfulness or willful blindness and recklessness, will meet Plaintiff's burden. And because we find her explanation credible, that finding undermines the basis for an award of sanctions under the Court's inherent powers. *See, e.g., JTR Enters.,* 697 F. App'x at 987 (upholding denial of sanctions because the movant had not "prove[n] that any basis existed for sanctions"); *Geiger v. Carnival Corp.,* No. 16-24753-cv, 2017 WL 9362844, at *7 (S.D. Fla. Oct. 4, 2017) (denying motion for inherent powers sanctions because the movant "failed to meet its burden of showing both a clear record of ... willful conduct and that lesser sanctions are inadequate"); *report and recommendation adopted,* 2017 WL 9362843 (S.D. Fla. Oct. 31, 2017).

This finding from an Eleventh Circuit case reversing sanctions is particularly apt here:

> We reverse the district court's imposition of sanctions. . . . No party in this case acted with bad intentions, but the result was a colossal waste of time and effort. We trust that the damage done to the parties' credibility, finances, and time is enough of a sanction to curb their conduct and to serve as a warning to future diversity jurisdiction litigants.

*Purchasing Power, LLC v. Bluestem Brands, Inc.,* 851 F.3d 1218, 1228 (11th Cir. 2017).

The same ultimately holds true for Plaintiff's case for sanctions against counsel under section 1927. Plaintiff argues that recklessness is a sufficient basis to award fees under section 1927. But as the Eleventh Circuit pointed out in *Purchasing Power,* that is not entirely correct. "The idea of recklessness sufficing . . . comes from *Barnes*, which stated, '[a] finding of bad faith is warranted where an attorney

knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.' . . . The key to understanding the *Barnes* quote is that it is not saying recklessness suffices; it is saying recklessness plus a frivolous argument suffice." *Id.* at 1225.

Here, we readily find that Medline's failure to properly investigate was negligent, and indeed reckless. That failure is what caused counsel to represent to counsel and the Court that Medline was fully compliant with the consent decree. But that recklessness was not in the pursuit of a knowingly frivolous argument, or for the purpose of harming Plaintiff, or with the intent to commit perjury before the Court. That essential element of a finding of recklessness to sustain a sanction under section 1927 is missing in this case.

In short, as compelling a case for sanction as one will find is present in this record. The Court fully intended to award fees and costs at the start of the evidentiary hearing. But at the same time, we must recognize that the burden on Plaintiff here is a heavy one, and not one that we can readily ignore even in a case where justice would certainly support a finding of fees and costs. But justice alone is not the standard; we must comply with the essential requisite that the Eleventh Circuit has dictated in cases such as these. Based on that standard, and the Court's finding that Medline's witness was credible in her explanation of what transpired, the Court cannot hold that clear and convincing evidence of willfulness or culpable recklessness exists to warrant imposing fees and costs against Medline. Plaintiff will,

however, be made partially whole through the equitable award of disgorgement as discussed in the preceding section.

### III.   CONCLUSION

For the foregoing reasons, the Court recommends that the Court Grant the Motion to Enforce in part and make the following findings of fact and conclusions of law:

1.      The Court has ancillary jurisdiction to enforce the terms of the parties' settlement agreement.

2.      Based on the Court's equitable power to order restitution, as a means of enforcing the Cease and Desist provisions of the parties' settlement agreement, the Court should find that Medline must disgorge itself of all profits generate by all sales of the 1.0 Nasal Swabs that took place after December 31, 2021.  Medline shall file an affidavit or declaration of Ms. Cecola, within fourteen days of the Court's Final Order, that attests to the reduction of Medline's direct production costs for each of the 1.0 Nasal Swabs sold that are subject to the Court's Order.  Payment of the net amount of sales, representing Medline's profits from its wrongful violation of the Agreement's consent decree, shall be made together with the declaration.

3.      Plaintiffs' request for fees and costs, as a sanction under the Court's inherent powers or 28 U.S.C. 1927, should be Denied.

4.      Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to

timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g.*, *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security*, 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 16th day of April, 2024.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge